UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THOMAS CARL BUTZ | ) | CASE NO. 15-10340(1)(7) |
| SHAWN C. BUTZ | ) | |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| CLARENCE CAMPBELL | ) | AP NO. 16-1013 |
| DONNA CAMPBELL | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THOMAS CARL BUTZ | ) | |
| SHAWN C. BUTZ | ) | |
| | ) | |
| Defendant(s) | ) | |

**MEMORANDUM-OPINION**

This matter came before the Court for trial on the Complaint Objecting to Discharge filed by Plaintiffs Clarence and Donna Campbell ("Plaintiffs") against Defendants/Debtors Thomas C. Butz and Shawn C. Butz ("Debtors"). The Court considered the testimony of the witnesses, the documentary evidence tendered at trial and arguments of counsel for the parties. For the following reasons, the Court will enter Judgment in favor of the Plaintiffs and against the Debtors.

**FACTS**

Debtor Thomas Butz worked as a mechanical engineer for thirty years. In 2008 his employer, Wrigley, Chicago was bought out. After receiving a severance package from Wrigley, he started an engineering consulting business. Shortly thereafter Thomas and his wife Shawn and

their two sons moved to Florida so that Thomas could try to franchise his consulting business. This was unsuccessful and six months later, they returned to Chicago.

Debtor Shawn Butz ran a fashion business called Shawn Renee Fashions, Inc. ("SRF") which initially concentrated on wedding shows. The wedding show business generated only a few thousand dollars a year.

Although neither of the Debtors had any experience in owning/operating a retail business, in 2009 and early 2010, Debtors began discussing the idea of opening a fashion boutique selling specialty footwear: flip flops with "popits" attached. These were interchangeable crystals that went on the footwear. Shawn met Donald Ray who owned the "popit" brand, which was entirely web-based. Shawn began discussions with Ray about opening a retail location to sell popits in either Las Vegas or Hawaii. The Debtors ultimately decided on Waikiki Beach in Hawaii.

Thomas Butz used his Wrigley severance package, as well as the couple's retirement accounts and savings totaling approximately $400,000, as capital for the new business. He drew up a business plan and tried to obtain financing from several financial institutions. Since the couple had no previous retail experience they were unable to obtain financing from a bank. Therefore, they approached their relatives about obtaining loans to start the business.

The business plan indicated the business would sell "popits" plus companion products such as sunglasses, charms, jewelry and purses. Debtors estimated the business would make a gross profit of 65% with 35% in overhead. The plan estimated the start up cost to build out the store, to acquire inventory and rental costs at approximately $750,000. Debtors grossly underestimated the startup costs.

Thomas Butz initially approached his parents about a loan for the business and they agreed to loan the Debtors $100,000. The Debtors also approached the Plaintiffs, Shawn's parents, and obtained a $240,000 loan. Thomas handled all of the business' finances and prepared all of the business projections for their parents to review.

Once their parents agreed to loan Debtors the money, Thomas had an attorney in Chicago, Russell Baldwin, prepare the loan documents. Baldwin prepared a Promissory Note, Security Agreement and UCC-1 Statements. The Security Agreement gave the Plaintiffs a security interest in the "personal property/equipment listed on Exhibit A." However, there was no Exhibit A attached. The Debtors represented to the Plaintiffs that they were receiving a security interest in the Debtors' personal property. A UCC-1 Financing Statement was filed in Illinois perfecting Plaintiffs' valid first lien. Baldwin also drafted Personal Guaranty Agreements that were signed by Shawn as President and Thomas as Secretary of SRF on June 14, 2010. Prior to execution of the documents, the Debtors sent Plaintiffs a letter enclosing the loan documents and stated, " . . . its between our company (Shawn Renee Fashions, Inc.) and you, but it's guaranteed by us personally so there's no risk to you." Under the terms of the loan documents, Debtors were required to make interest only payments to Plaintiffs on the first day of each month, at an interest rate of 15% per annum, until July 1, 2011, when the principal would become due.

The SRF business account records showed that on June 14, 2010, $240,000 was wired from the Plaintiffs' bank account into the business account of SRF. Two days later, $200,000 was transferred from the SRF business account into the SRF savings account. The $100,000 loan from Thomas' parents also went into SRF's savings account.

The Debtors entered into what turned out to be a disastrous contract with Donald Ray for inventory.

After Debtors obtained the family financing, they began searching for real estate upon which to build the store. The initial building costs and inventory were higher than Debtors anticipated. They therefore requested and received an additional loan of $60,000 from the Plaintiffs. The parties executed an Addendum to the initial Loan Agreement to cover this loan.

The Debtors hired Dave Foster of Dave Foster Builders, Inc. to build the store out, including displays and cabinets. They owed Foster Builders $133,000 for his work, but fell behind on payments to him. Once that happened, Foster Builders initiated a lawsuit against Debtors in 2011, the year the store opened. In order to pay Foster Builders, Debtors needed more money and approached Thomas' sister and brother-in-law who "invested" $200,000. Although Thomas called it an investment, the loan was documented similarly to the other family loans and contained a monthly payment schedule, plus interest that was not based on the success of the store. Debtors also personally guaranteed this loan.

Although projected to open in January, the store did not open until April 2011. The store was located in a high-end retail area of the island with monthly rent of $18,000. Debtors paid a realtor $23,000 to find the store's location on top of store build out expenses. The Debtors had miscalculated their start up costs so badly that by the time the store opened in April, the balance in the SRF business account was only $1,501.

Debtors regularly transferred funds from the SRF business account to cover their personal and living expenses. Thomas Butz paid himself $8,000 per month. They also made hourly wage payments to themselves in order to have the business cover their health insurance.

The bank account records of SRF showed $80,000 from the first loan from the Plaintiffs went into Debtors' personal account. While in Hawaii, Debtors lived for seven months at the Trump Hotel. SRF paid $36,172 for their living expenses over that time period. Debtors' claimed it was the only place they could get on a short term basis that was close to the store.

While Debtors stayed at the Trump Hotel, they put their son up in the Outrigger Reef Hotel at a cost of $9,579 over the same period. They also paid for the store manager to stay with their son at the Outrigger.

The bank records also showed that in 2010, Debtors sent their son to a private camp that cost $30,000 during the time they were trying to start the business.

The credit card transactions from the SRF business account were replete with debit card withdrawals for personal expenses. Numerous items were purchased from QVC, Nordstrom and Macy's online. Shawn Butz claimed that she was buying products that she would use to test as inventory in her store. She would take ideas from these products and then try to design her own item and incorporate part of the design into her product. Debtors had no licensing agreements or permission from these retailers to resell their products.

The bank records also showed entries for $3,900 for Chanel and $1,700 for Chicago Cosmetic Surgery, neither of which the Debtors could explain. In 2010 there was 73 items purchased online with the corporate funds and only 20 returned to the seller. Debtors were unable to explain what happened to the items purchased but not returned.[1]

---

[1]Shawn Butz testified that all products purchased and not returned to the merchants, went to Donald Ray who repaid her in inventory for the items. There was no documentary evidence to support this claim.

The bank records also showed numerous checks made payable to "cash" in February 2011 for another $9,055, $4,410, $18,900 and $59,211.25. Debtors testified these were payments to Donald Ray for inventory. Ray required wire transfers directly into his Wells Fargo account. There was no way to trace these funds directly to the purchase of inventory. Ray only gave SRF a discount on inventory sales when the Debtors bought in bulk. This caused Debtors to acquire too much inventory.

Debtors first realized in September and October 2011 that they would not make their projected sales goal of $1,210,000. The sunglasses and jewelry products were not selling and the company showed a loss in 2011. They had gross sales of $569,000 but they did not have enough cash flow to cover their expenses.

By May 2012, the Debtors had to close the store. They did not get their security deposit of $120,000 back on the store. Any remaining business assets were sold, but no payments were made to the Plaintiffs who had a lien on these assets and the proceeds. The remaining inventory was sold back to Donald Ray at a loss.

Plaintiff Donna Campbell testified that she saw lots of packages from QVC in the store that her son-in-law stated were items that had been put in the budget. In making the loans to the Debtors, Donna Campbell testified that she did not know that any of their money would be used for anything other than business expenses. She did not know any of the money would be used by the Debtors for their living expenses.

Debtors made interest only payments on the loan to Plaintiffs from June 2010 to August of 2011. Debtors did not make the principal payment due on July 1, 2011. Debtors made a few more

interest only payments in 2012. By September 2012, when the Debtors stopped making payments on the loan, the balance owed to the Plaintiffs was $328,589.

Debtors tendered Exhibit #16 in support of their claim that they personally invested $401,969 into the failed business from several different bank accounts. Debtors acknowledged at trial that this Exhibit was misleading and inadequate because Thomas Butz had lost many of the business records. He testified that he put many of his business records in a storage bin that was placed in a storage unit in Hawaii. That storage unit was later auctioned and they lost the records in the bin. Many of the records used in this case were obtained by the Plaintiffs by subpoena. However, many of the SRF business records not produced related to the period when the Plaintiffs made their loans to the business and how the loan proceeds were used.

On March 13, 2015, Plaintiffs filed a Complaint in Hamilton County, Ohio Court of Common Pleas against Debtors. The Complaint asserted claims for breach of contract, unjust enrichment and fraud in the inducement based on Debtors actions in inducing them to enter into the loan agreements and failing to repay the loans.

On April 2, 2015, Debtors filed their Voluntary Petition seeking relief under Chapter 7 of the United States Bankruptcy Code.

On March 22, 2016, the Plaintiffs initiated this adversary proceeding against the Plaintiffs seeking a Judgment of nondischargeability and denying the Debtors a discharge.

## **LEGAL ANALYSIS**

Plaintiffs seek a Judgment against Debtors to have the debt owed to them by Debtors declared nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(6) and that the Debtors' discharge be denied pursuant to 11 U.S.C. § 727(a)(3) and (a)(6)(A).

A. <u>The Debt Owed to the Campbells by the Debtors is Nondischargeable</u>.

   (1) <u>Claim Under 11 U.S.C. § 523(a)(2)(A)</u>.

Under 11 U.S.C. § 523(a)(2)(A), a discharge under 11 U.S.C. § 727 does not discharge an individual from any debt for money obtained by "false pretenses, a false representation, or actual fraud. . . ." *In Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir. 1998), the Sixth Circuit stated the objecting creditor has the burden of proving by a preponderance of the evidence, the following elements: (1) the debtor obtained money through a material misrepresentation that at the time, the debtor knew was false or made with clear recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of the loss.  The Campbells met their burden of proof on each of these elements.

The Campbells had to first prove that Debtors made a material misrepresentation, misleading omission or committed actual fraud and did so knowingly or with reckless disregard for the truth. Here, there was ample evidence that Debtors induced the Campbells to make the loans for use in the SRF business.  In fact, however, the Debtors transferred funds loaned to the business from the business bank account into their own personal account and used such funds to pay their own lavish personal and living expenses.

The Plaintiffs proved that the Debtors intended to deceive the Campbells. A debtor's intent to defraud a creditor is measured by a subjective standard based upon the totality of the circumstances. *Rembert*, 141 F.3d at 281-82. Fraudulent intent may be proven by course of conduct or circumstantial evidence. *Allen v. Smith (In re Smith)*, 567 B.R. 529 (Bankr. M.D. Tenn. 2017). The Debtors induced the Campbells to loan them funds to start the business. Instead, Debtors' used approximately $80,000 from the business account for their own personal expenses before the store even opened. There was also evidence that Shawn Butz used corporate money to buy personal items online and instead of incurring reasonable living expenses by renting an apartment, Debtors stayed at the Trump Hotel and used thousands of dollars for their personal living expenses.

Intent to deceive occurs when a debtor makes a false representation which the debtor knows or should have known would induce another to advance money. *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913 (Bankr. N.D. Ohio 2001). Clearly, the Debtors' actions in inducing the Campbells to loan the funds to start the business but instead using a large portion for personal expenses, supports this conclusion.

Next, the Campbells had to prove that they justifiably relied on the false representation. Justifiable reliance involves consideration of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case. *Oaks v. Miller (In re Miller)*, 2016 WL 7115865 (E.D. Ky. 2016). In this case, the Plaintiffs were dealing with their daughter and son-in-law. Thomas Butz' education and years of experience as a successful mechanical engineer is indicative of a thoughtful professional. They had no reason to believe that their money would be used for anything but the business as was represented by the Debtors. A creditor is only required to act appropriately according to his individual circumstances. *Frost & Co., Inc. v. Smithey (In re*

*Smithey)*, 474 B.R. 830, 838 (Bankr. N.D. Ohio 2012). The Campbells justifiably relied on Debtors' representations based upon the circumstances.

Finally, the Campbells' loss was caused by their reliance on the Debtors' false representations. There clearly is a link between the Debtors' false representations and the creation of the debt. While making large sales projections, the Debtors were underminding the business' viability by using large amounts of the loan proceeds on excessive purchases and spending which contributed to the company's failure. For these reasons, the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

(2)  Claim Under 11 U.S.C. § 523(a)(6).

Pursuant to 11 U.S.C. § 523(a)(6), a debtor will not receive a discharge under § 727 from any debt "for willful and malicious injury by the debtor to another entity or the property of another entity." The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). Debts arising out of acts constituting conversion can satisfy this standard. *See*, *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264 B.R. 866 (Bankr. W.D. Ky. 2001).

In Kentucky, the wrongful exercise of dominion and control over the property of another constitutes conversion and may be considered a willful and malicious injury. *Post Road Partners, LLC v. Walters (In re Walters)*, 359 B.R. 156 (Bankr. E.D. Ky. 2006). The preponderance of the evidence submitted at trial established that the Debtors exercised dominion and control over the loan proceeds provided by the Campbells for use in the business, while also using some of the funds for personal expenses. The facts, however, do not establish that the Debtors acted with specific intent

-10-

to harm the Plaintiffs. However, the Court can infer this intent from the circumstances of the case. *See*, *In re Sweeney*, 264 B.R. 866, 872 (Bankr. W.D. Ky. 2001). The Debtors converted the loan proceeds intended for the business to their own use. The Debtors also knew that they had given the Plaintiffs a lien on their personal property. They sold much of their personal property without turning the proceeds over to the Plaintiffs. These actions are considered a willful and malicious injury to the Plaintiffs. The facts support a finding that the debt is nondischargeable under 11 U.S.C. § 523(a)(6).

B. Debtors are not Entitled to a Discharge.

(1) Claim under 11 U.S.C. § 727(a)(3).

Under 11 U.S.C. § 727(a)(3), the Court may deny discharge where the "debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, records and papers from which the debtor's financial condition or business transaction might be ascertained unless such act or failure to act was justified under all of the circumstances of the case." The party objecting to discharge has the burden to establish by a preponderance of the evidence that debtor should be denied a discharge. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); Fed. R. Bankr. P. 4005. The Plaintiffs had to prove either (1) that the Debtors failed to keep or preserve any recorded information, including books, documents, records and papers; or (2) the Debtors, or someone acting for the Debtors, committed an act of destruction, mutilation, falsification or concealment of any recorded information including books, documents and records. The Bankruptcy Code requires debtors to provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Bergeron v. Ross*

*(In re Ross)*, 367 B.R. 577 (W.D. Ky. 2007).  Once this is shown, the burden shifts to debtors to justify the lack of records.  *Id.*

On August 25, 2015, in Debtor's Chapter 7 case, the Court entered an Order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure permitting the Debtors' examination by the Plaintiffs and requiring the Debtors to produce certain documents set forth in the Order.  Among the documents Debtors were ordered to, but failed to produce, were their 2010 federal and state tax returns, the 2010 and 2013 corporate tax returns for SRF, SRF bank statements for January 1, 2010 through December 31, 2014, bank records showing deposits of the Plaintiffs' loan into the SRF business or corporate account, as well as the check ledger for SRF.  Both Debtors testified that Thomas Butz placed many of the records in a storage bin that was placed in a storage unit in Hawaii. That unit was later auctioned and the documents were lost.

While some of the above referenced documents were obtained by the Plaintiffs by subpoena in this adversary proceeding, it was not the Plaintiffs' burden to locate Debtors' missing business records.  The adequacy of a debtor's records must be determined on a case by case basis. Considerations courts use to make this determination include "the debtor's occupation, financial structure, education, experience, sophistication and any circumstances that should be considered in the interest of justice."  *Taunt v. Patrick (In re Patrick)*, 290 B.R. 306, 311 (Bankr. E.D. Mich. 2003), quoting *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990).

Here, the Debtors were both well educated, sophisticated business people.  To fail to produce such basic business documents as corporate tax returns and check ledgers for the business shows either an utter disregard for the complexities of the venture they undertook using hundreds of

-12-

thousands of dollars of their relatives' money or purposeful deceit. Considering all of the above factors, it is clear that the Plaintiffs established that the Debtors did not adequately preserve or maintain adequate records in order to ascertain the Debtors' financial condition with substantial completeness. Debtors failed to justify the lack of records. Therefore, the Debtors are not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(3).

(2) Claim Under 11 U.S.C. § 727(a)(6)(A).

Under 11 U.S.C. § 727(a)(6)(A), the Court is required to grant a debtor a discharge unless "the debtor has refused to obey a lawful order of the court to respond to a material question or to testify." Plaintiffs contend that the Debtors' failure to produce documents pursuant to the August 25, 2015 Order entered in the underlying Chapter 7 case pursuant to Rule 2004 constitutes a failure to obey a lawful order of the court under 11 U.S.C. § 727(a)(6)(A). Such Orders are considered lawful orders of a court. *See Lewis v. Casab (In re Casab)*, 523 B.R. 543, 551 (Bankr. E.D. Mich. 2015). The Court notes that a review of the file in the Debtors' Chapter 7 bankruptcy case does not show that Debtors ever challenged the validity of the Rule 2004 Order requiring Debtors' examination and production of the requested documents.

The denial of discharge under 11 U.S.C. § 727(a)(6) is subject to the discretion of the court. *In re Patrick*, 290 B.R. at 313. The word "refused," as used in § 727(a)(6)(A) is distinguishable from the word "failed" used elsewhere in § 727(a). The mere failure of a debtor to obey a court's order, without more, is insufficient to deny or revoke the debtor's discharge. *Id.*

In response to this claim, Debtors state in their pretrial brief that they produced all banking records and tax records to the Plaintiffs for review. Plaintiffs stated that they were able to obtain some of the documents not produced by the Debtors by subpoena. The record does not support

Debtors' claims that all documents were produced. The Court cannot conclude that Debtors willfully refused to comply with the 2004 Examination Order. However, the Debtors have not demonstrated that their failure to comply with the Order was beyond their control or impossible. The overwhelming weight of the evidence is that the Debtors lacked candor and credibility such that the factors under this analysis weigh against them. Clearly, Debtors could have obtained the same documents that Plaintiffs ultimately obtained by subpoena. For this reason, the Court finds Debtors refused to obey a lawful Order of the Court and therefore, are not entitled to a discharge under 11 U.S.C. § 727(a)(6).

## **CONCLUSION**

For all of the above reasons, Judgment in favor of the Plaintiffs and against Debtors Thomas C. Butz and Shawn C. Butz declaring the debt of $338,589, plus interest at the rate of 15% per annum is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6) and that Debtors Thomas C. Butz and Shawn C. Butz are denied a discharge pursuant to 11 U.S.C. § 727(a)(3) and (a)(6)(A). A Judgment incorporating the findings herein accompanies this Memorandum-Opinion.

# UNITED STATES BANKRUPTCY COURT
# FOR THE
# WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THOMAS CARL BUTZ | ) | CASE NO. 15-10340(1)(7) |
| SHAWN C. BUTZ | ) | |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| | ) | |
| CLARENCE CAMPBELL | ) | AP NO. 16-1013 |
| DONNA CAMPBELL | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THOMAS CARL BUTZ | ) | |
| SHAWN C. BUTZ | ) | |
| | ) | |
| Defendant(s) | ) | |

## JUDGMENT

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment is entered in favor of the Plaintiffs Clarence and Donna Campbell declaring the debt owed to them by Debtors Thomas C. Butz and Shawn C. Butz in the amount of $328,589, plus interest at the rate of 15% per annum nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Debtors Thomas C. Butz and Shawn C. Butz are denied a discharge under 11 U.S.C. § 727(a)(3) and (a)(6)(A).

This is a final and appealable Judgment. There is no just reason for delay.